**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

**JAMES CALVIN PARTTRIDGE, JR.**                                               **PLAINTIFF**

**v.**                                                        **CIVIL ACTION NO. 3:24-CV-343-MPM-RP**

**PANOLA COUNTY, MISSISSIPPI; CITY OF BATESVILLE,
MISSISSIPPI; SHANE PHELPS, in his official and individual
capacities; MELISSA MEEK-PHELPS, in her official and individual
capacities; MATTHEW BROWN, in his official and individual
capacities; JOSH GRIFFIN, in his individual capacity;
LINDSEY O'CONNER, in her individual capacity,
and JOHN DOES 1-10**                                              **DEFENDANTS**

**ORDER**

This cause comes before the court on the motion of defendants Shane Phelps, in his

individual and official capacity as Sheriff of Panola County, Mississippi, Melissa Meek-Phelps,

in her individual and official capacity as Circuit Clerk of Panola County, Mississippi, and Josh

Griffin, to dismiss them from this action pursuant to Fed. R. Civ. P. 12 or, alternatively for

summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiff James Parttridge has responded in

opposition to the motion, and the court, having considered the memoranda and submissions of

the parties, is prepared to rule.

This is, *inter alia*, a First Amendment retaliation action in which plaintiff James "Jamie"

Parttridge, a locally-well known internet blogger and political gadfly, asserts that he suffered a

sustained campaign of retaliation from, among others, Panola County Sheriff Shane Phelps and

his wife Panola County Circuit Clerk Melissa-Meek Phelps, in response to his First Amendment

activities towards them. This court notes that the complaint asserts a number of acts of

1

misconduct towards plaintiff by Sheriff's Department personnel, but several of these acts are

alleged to have occurred more than three years before this action was filed on November 4, 2023.

As discussed below, this court finds these older claims to be time-barred under § 1983's three-

year statute of limitations for claims arising in this state. *See Giles v. Stokes*, 988 So. 2d 926,

928 (Miss. App. 2008).   Nevertheless, this court will note these allegations for the record, since,

even if they are not recoverable, they may be significant in understanding the alleged past history

between plaintiff and members of the Sheriff's Department.

      In his complaint, plaintiff describes the early acts of misconduct directed towards him as

follows:

> a. On or about February 4, 2021, Plaintiff was stopped, handcuffed, and jailed without probable cause or legal justification, resulting in the loss of his liberty and violation of his constitutional rights;
> b. On or about April 21, 2021, Plaintiff was arrested and held in solitary confinement for eight days without charges, access to counsel, or a hearing;
> c. On or about July 12, 2021, Sheriff Deputies entered Plaintiff's home without a warrant or consent while he slept, violating his Fourth Amendment rights;
> d. On or about November 2, 2021, Defendant Griffin fired shots at Plaintiff on his property. Despite Plaintiff filing a formal complaint, no action was taken by Sheriff Phelps or other public officials;
> e. On or about December 3, 2021, while Plaintiff hunted, Sheriff Deputies conducted an illegal search of Plaintiff's vehicle without probable cause or consent, and had his vehicle towed without issuing a traffic citation and leaving him stranded; and
> f. On or about July 12, 2022, Plaintiff was subjected to a public arrest at gunpoint while he fished, searched Plaintiff's vehicle without probable cause or consent, seized his firearms, ammunition, and other personal property, and jailed Plaintiff over an alleged minor parking violation. Plaintiff was forced to spend forty-eight hours in the Panola County Jail over this alleged minor parking violation. The alleged minor parking violation was dismissed on or about October 26, 2022.
> 16. Each of these incidents was part of a deliberate strategy to harass and intimidate Plaintiff, resulting in the loss of employment and inability to secure new employment; substantial financial losses defending against baseless charges; severe emotional distress requiring professional mental health treatment; and damage to his reputation in the community.

[Complaint at 4-6].

Plaintiff alleges that this campaign of retaliation became particularly heated after, on November 6, 2023 – the day before an election - he protested on the sidewalks in downtown Batesville with signs which, among other things, accused Sheriff Phelps of leading a "Goon Squad" and urging voters to support his opponent in the election. In setting forth his version of the events of November 6, 2023, plaintiff alleges in his complaint that:

> 17. On November 6, 2023, the day before the general election on which Sheriff Phelps and Clerk Meek-Phelps were on the ballot, Plaintiff exercised his First Amendment right to free speech by publicly campaigning against Sheriff Phelps and Clerk Meek-Phelps on Public Square in Batesville. His protest signs and vocal criticisms were free from incitement, threats, and obscenities and fully complied with all local rules and regulations.
> 18. Video surveillance and phone records from November 6, 2023 document that Sheriff Phelps and Clerk Meek-Phelps directed Batesville officials to remove Plaintiff from the area, despite his lawful right to protest.
> 19. After being threatened with fines, Plaintiff briefly left but returned with modified campaign signs that still complied with all applicable regulations.
> 20. Sheriff Phelps and Clerk Meek-Phelps then contacted the Mayor of Batesville, Mississippi, Hal Farrell, urging him to have Plaintiff arrested for disorderly conduct. Mayor Farrell directed his Police Chief Carrie Pittman to make the arrest, but Chief Pittman refused, opining that Plaintiff had not violated any law.
> 21. During this incident, Sheriff Phelps also contacted Panola County Justice Court Judge Michael Darby. Judge Darby soon thereafter confronted Plaintiff on Public Square and attempted to intimidate him into leaving. Video surveillance shows Judge Darby had to be physically restrained from confronting Plaintiff and removed from the scene by his spouse.
> 22. Plaintiff subsequently secured surveillance video footage from November 6, 2023 and posted it on YouTube to publicize the conduct of local public officials and their efforts to silence his legal and peaceful protest.

[Complaint at 6-7]. In describing the events which followed plaintiff's posting video of his protests on social media, the complaint alleges that:

> 23. On or about November 27, 2023, Plaintiff appeared before the Panola County Board of Supervisors during their regular meeting to report the pattern of harassment he had endured. Sheriff Phelps was present at this meeting and heard Plaintiff's detailed account of misconduct firsthand. Plaintiff also submitted a ten-page handwritten letter to the Board documenting specific instances of harassment, retaliation, and misconduct by law enforcement. Although several Board members privately expressed concern about Plaintiff's allegations, the Board took no official action to investigate or address his complaints, effectively emboldening further retaliation by Defendants.

3

24. On December 5, 2023, Defendants coordinated and executed a plan to retaliate against Plaintiff for publicly expressing his concerns regarding, past events, his safety, and public corruption.

25. Following a morning phone conversation with Plaintiff, Clerk Meek-Phelps immediately contacted Judge Darby and Sheriff Phelps, falsely claiming that her conversation with Plaintiff had caused her to fear for her life.

26. Clerk Meek-Phelps admits this in an affidavit she later executed regarding this phone call.

27. Clerk Meek-Phelps then traveled to Sheriff Phelps' office to meet with him in person to discuss the matter further.

28. Sheriff Phelps requested a Batesville Police Officer to come to his office to take a report concerning Clerk Meek-Phelps' allegations against Plaintiff.

29. With the assistance of Sheriff Phelps and others, Clerk Meek-Phelps drafted the aforementioned affidavit which contained multiple false allegations, including, but not limited [to] Plaintiff calling her "an abrasive b - - - -" and Plaintiff saying, "you're gonna [sic] see me everywhere you look [sic] I'm not done with you yet."

30. Clerk Meek-Phelps' and Sheriff Phelps initially sought to charge Plaintiff with making terroristic threats, a felony, but they were advised against it.

31. Clerk Meek-Phelps' and Sheriff Phelps settled on filing a misdemeanor telephone harassment charge against Plaintiff.

32. Additional unknown county and city officials were also present during this meeting and participated in planning Plaintiff's demise;

33. Batesville Police Officer Matthew Brown, despite witnessing the fabrication of charges, disregarded his duty to protect Plaintiff and deliberately chose to present false information to the Municipal Court Judge for Batesville to obtain an arrest warrant.

34. Sheriff Phelps also made multiple calls to expedite the warrant process for Plaintiff's arrest.

35. Communication records will confirm that Sheriff Phelps and Clerk Meek-Phelps also pressured O'Connor and Griffin to file additional false charges against Plaintiff for telephonic harassment in Panola County Justice Court, the same court where Judge Darby then served as one of two judges.

[Complaint at 7-8]. Based upon these and other allegations, plaintiff filed this action asserting both federal and state claims against defendants, and several of the county defendants have presently moved to dismiss the claims against them.

This court notes that this is not the first recent case in which it has confronted allegations of abuses of power among Panola County officials. In *Perkins v. Panola Cnty. Bd. of Supervisors,* 709 F. Supp. 3d 260, 265 (N.D. Miss. 2024), which has since settled, this court considered claims filed against members of the Panola County Board of Supervisors by a local

police officer who had (quite correctly) refused to follow the orders of a member of the Board not to take custody of the member's grandson and return him to his lawful guardian. *Perkins,* 709 F. Supp. 3d at 263. Soon afterwards, the Board of Supervisors voted to revoke leave benefits which had been granted to the police officer, in such a manner as to raise strong suspicions of unlawful retaliation. *Id.* at 264. In denying the motion to dismiss filed by the defendants in *Perkins*, this court wrote that the plaintiff had "asserted strong and plausible claims that she was retaliated against by the defendants in this case for having simply done her job, in such a manner as to constitute a severe abuse of official power." *Id.* at 265.

This court finds the allegations of abuse of power in this case to be quite reminiscent of those in *Perkins*, although it believes that Mr. Parttridge is considerably less sympathetic, on a personal level, than the plaintiff in that case. Indeed, defendants place heavy emphasis upon the fact that Mr. Parttridge has multiple arrests for, *inter alia*, acts of domestic violence, although their brief generally describes these as involving "arrests," and not convictions. [Brief at 3]. In any event, the First Amendment, like other provisions of the U.S. Constitution, protects both saints and sinners, and, for the reasons discussed below, this court believes that plaintiff has potentially strong claims that his First Amendment rights were seriously infringed upon in this case.

In opposing dismissal at this early stage of the proceedings, plaintiff is greatly assisted by the fact that this court is required to view the facts in the light most favorable to him, as the non-moving party. Indeed, the U.S. Supreme Court made it clear in *Tolan v. Cotton*, that "[o]ur qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard." *Tolan*, 572 U.S. 650, 656-57. (citations omitted). Moreover, many of the factual

issues in this case come down to a question of motive, such as whether Ms. Meek-Phelps' actions in filing charges against plaintiff were motivated by a genuine fear of him, or, instead, by a desire to retaliate against him for his First Amendment activities. Without question, assessing the motivation of a particular individual is, inherently, a fact-intensive process which a jury is best suited to perform, which leaves defendants in a poor position to ask this court to decide these disputed fact issues in a manner favorable to them before trial.

Yet another advantage enjoyed by plaintiff in this context lies in the fact that the U.S. Supreme Court has held that, to shift the burden of proof to the defendant, a First Amendment retaliation plaintiff need only establish that retaliation for protected speech was a substantial or motivating factor behind any adverse action he received. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274 (1977). This precedent makes it easier for a First Amendment retaliation plaintiff to survive a motion to dismiss or summary judgment than, say, a Title VII retaliation plaintiff, who faces a more daunting "but for" causation standard under Supreme Court precedent. *See Univ. of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013).

With this legal precedent in mind, this court will now turn to a discussion of the merits of this case, although, in doing so, it wishes to emphasize that this litigation is at a very early stage, and discovery has not been conducted. Defendants' decision to seek dismissal at this early stage has become increasingly common in § 1983 cases, following the Fifth Circuit's decision in *Carswell v. Camp*, 54 F.4th 307, 311 (5th Cir. 2022). While it is defendants' right under *Carswell* to obtain an early (and appealable) ruling on their motion to dismiss, they must still play by the ground rules applicable to Rule 12 motions in doing so.

That brings this court to the fact that the instant motion requires it to confront, once again, what appears to be a growing trend in federal civil litigation in this district, which is *not*

6

authorized by *Carswell*. Namely, there appears to be an increasing trend by which defendants seek Rule 12 dismissal based not upon the allegations of the complaint, but, rather, upon substantive evidence which they attach to their answer or to a motion to dismiss. As discussed below, the Fifth Circuit has made it clear that this is only permissible in certain limited contexts, and to a limited extent, but it appears that civil defendants in this district have resolved to constantly push the limits in this regard.

This court recently confronted these issues in *Jones v. Tate Cnty., Mississippi*, 2025 WL 1981211 (N.D. Miss. July 16, 2025), which involved wrongful death claims arising out of a fatal shooting by a Tate County deputy. In *Jones*, this court ultimately agreed with defendants that plaintiff's claims could not withstand even Rule 12 scrutiny, but, in doing so, it called foul upon defendants' efforts to supplement their motion with certain extrinsic evidence which they attached to their complaint. In doing so, this court wrote that:

> While this court ultimately agrees with defendants regarding the substantive merits of this case, it is still given considerable pause by their request that it decide this case in the context of a Rule 12(c) motion to dismiss on the pleadings, while at the same time considering a wide array of evidence which Tate County attached to its answer to the complaint. The problem with defendants' request is that, in seeking Rule 12(c) dismissal, they make a much more aggressive use of extrinsic evidence than this court can recall seeing in a Rule 12 motion, so much so that it appears to be, for all practical purposes, a Rule 56 summary judgment motion. The most prominent evidence in this regard is the bodycam video of the shooting incident which gave rise to this lawsuit, but that is far from the only such evidence cited in defendants' motions. To the contrary, Deputy Bryok also cites a Mississippi Bureau of Investigation (MBI) report, [brief at 20, n. 5], as well as certain other evidence which Tate County attached to its answer, including a document detailing the decedent's extensive criminal history.
> In light of the foregoing, this court must wonder how it would be deciding a motion to dismiss "on the pleadings" if it is to assess the reliability of a wide range of evidence. Moreover, on a basic fairness level, it strikes this court as quite problematic to take a plaintiff's complaint which lacks any exhibits and thereupon permit the defendants to pick and choose exactly which proof the court should consider in deciding the merits of the case.

*Jones*, 2025 WL 1981211, at *2.

In explaining the Fifth Circuit precedent which governs this issue, this court wrote that:

> In so stating, this court recognizes that there is long-standing Fifth Circuit precedent holding that:
>> If the Court considers the matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all material that is pertinent to the motion." Fed.R.Civ.P. 12(d). **However, "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his] claim."**
>> *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)(emphasis added). The rule stated by the Fifth Circuit in *Collins* strikes this court as being quite correct since, if a plaintiff makes reference in his complaint to documents which are "central to [his] claim" then it seems entirely fair to permit the defendant to utilize those documents in any Rule 12 motion to dismiss. In the court's view, it should not make any great difference whether the defendant has attached the documents in question to its answer or to its motion to dismiss since, in either event, it is attempting to raise evidence which it regards as helpful to its defense.

*Id.* (emphasis in original).

This court thus noted in *Jones* that Fifth Circuit precedent limits its consideration, in the Rule 12 context, to documents attached to a motion to dismiss which are both 1) referenced in the plaintiff's complaint and 2) are central to his claim. *Id.*, citing *Collins*, 224 F.3d at 498. In giving examples of the evidence in defendant's motion to dismiss which went well beyond this limited rule, this court wrote in *Jones* that:

> It seems abundantly clear that, in this case, defendant seeks to go far beyond the *Collins* rule, in a manner which, if this court were to permit it, would eviscerate the fairness protections in that rule. For example, in seeking dismissal, defendant relies upon the MBI report regarding the shooting in this case which defendant Tate County attached to its answer to the complaint. [Defendant's brief at 5, note 24, citing Docket entry 38-1]. It is quite unsurprising that plaintiff never cited that report in her complaint, since the investigating officer found, among other things, that "I have concluded with a high degree of certainty that Deputy Benjamin Bryok's 'use of deadly force' was in response to apparent and immediate threats of great bodily harm and/or death to him." [38-1 at 12].

> Needless to say, the MBI report in this case is not "central to plaintiff's claims." In fact, it is highly damaging. That being the case, *Collins* would clearly prohibit this court from considering that report if it had been attached to defendants' motions to dismiss, and their entire argument for its admissibility arises from the fact that Tate County attached it to its answer, rather than a motion to dismiss. To this fact, this court must wonder: so what? An

8

> answer submitted by a defendant is hardly an unimpeachable writ; to the contrary, it is a partisan document, the content of which is fully in the control of the defendant. That being the case, if defendants were permitted to bypass the *Collins* rule simply by attaching documents to their answer then they would render that rule a nullity. Moreover, permitting a defendant to dictate what limited selection of helpful facts the district court is able to consider in its ruling would strike this court as being the judicial equivalent of a "canned hunt" which hardly comports with basic considerations of fairness.

*Jones*, 2025 WL 1981211 at *2-3.

This court has placed such emphasis on this procedural issue because it seems clear that allowing civil defendants to pick and choose the evidence which suits them, attach that evidence to a motion to dismiss, and thereby force a court to decide the case on the basis of this limited selection of the evidence threatens the basic integrity and fairness of the civil litigation process. This is equally true in cases such as *Jones*, where the defendants had the stronger case and were entirely capable of obtaining Rule 12 dismissal by simply "playing it straight." Indeed, even in cases where the defendants appear stronger, it would clearly be improper for this court, as the referee, to permit them to line up five yards offsides on every play. This court notes that, in *Jones*, it did conclude that defendant's citation to the bodycam footage of the shooting was proper, since it was, in fact, referenced in the plaintiff's complaint and was central to it, within the meaning of *Collins*. *Id.* This court accordingly relied heavily upon its analysis of that bodycam footage in concluding that Rule 12 dismissal would be appropriate.

This case involves certain video and audio recordings which, it is arguable, fall within the proper scope of a Rule 12 motion and thus might properly be considered in ruling upon it. In many other instances, however, both sides simply "say things" in their briefing which do not fall within the scope of *Collins'* holding. *Id.* For example, defendants contend in their brief that defendant Meek-Phelps is "deathly afraid of Mr. Parttridge," and they base this on her own self-

serving (and – as discussed below - demonstrably false) affidavit, which they attached to their motion to dismiss. [Brief at 8, exhibit A at 85].

Needless to say, plaintiff's complaint does not allege that Meek-Phelps was afraid of him, and this is the type of allegation which, this court believes, should only be made on summary judgment, after the witness in question has been subjected to cross-examination in a deposition. Indeed, as discussed below, Meek-Phelps' affidavit includes descriptions of a phone conversation between herself and plaintiff which a recording thereof demonstrates to be false. If this recording did not exist, then Meek-Phelps' false characterization of what plaintiff said to her would come down to a simple "he said/she said" dispute, and this illustrates the danger of deciding cases on the basis of evidence such as self-serving affidavits without first allowing that evidence to be tested in the discovery process. As a district court, this court has repeatedly observed how placing an emphasis on deciding cases *fast* over deciding them correctly leads to a degradation of the litigation process, and it must therefore lament the increasing trend in the opposite direction.

Addressing these issues in this case is complicated by the fact that, as noted above, both sides disregard the rules applicable to Rule 12 motions. Indeed, plaintiff not only does not appear to object to defendants pushing the limits regarding the use of extrinsic evidence in Rule 12 motions; to the contrary, he adds his own exhibits to the mix. Plaintiff's decision to do so may result from the fact that, aside from his history of domestic violence and other arrests, the early evidence in this case appears broadly favorable to him. Indeed, this court's impression in reviewing much of defendants' exhibits is to wonder: if this is the evidence they *want* it to see, what evidence might full discovery in this case reveal? Ultimately, the fact that both sides clearly seem to want this court to consider certain factual issues in this case leads it to conclude

10

that it should simply grant them their wish, but, in doing so, it wishes to emphasize its concerns that the limits applicable to Rule 12 motions be respected and that defendants should not be able to transform such motions into *de facto* summary judgment motions in which their own self-serving selection of the evidence is the only dish on the menu.

There are several allegations of unlawful conduct by defendants in this case, but this court will begin with a discussion of Sheriff Phelps' alleged actions on November 6, 2023. As to these events, defendants write in their brief that:

> Plaintiff argues that his First Amendment rights were violated on November 6, 2023, when he was allegedly asked to take down campaign posters he had created and was displaying on the town square the day before the general election in which Phelps and Meek-Phelps sought re-election. The posters provided: "Good Old Boy Phelps"; "Good Ole' Boy Goon Squad:[*sic*] Reginald Lantern, Jermey Hailey, Josh Griffin"; "Who in the Phelps do you think you are?"; "Get the Phelps out of my face vote Dennis Darby"; "Boo! What the Phelps is that smell"; "What the Phelps? Vote Darby."
>
> The 'Goon Squad' allegations are in reference to the six Rankin County Sheriff's Deputies who pleaded guilty to sixteen felonies in August 2023 arising out of their involvement in the torture and abuse of numerous victims from 2019-2022. This incident did not result in the arrest of Mr. Parttridge, rather he claims his First Amendment rights were violated by being forced to leave. He adds "after being threatened with fines, Plaintiff briefly left but returned with modified campaign signs that still complied with all applicable regulations."

[Defendants' brief at 24-25]. Defendants thus concede that plaintiff's reference to an alleged "Goon Squad" was not simply a childish insult, but, rather, appeared to assert that the Panola County Sheriff's Department under Phelps' watch had engaged in serious misconduct and that, accordingly, citizens should vote for his opponent in the election the next day. This is, without question, core political speech protected by the full force of the First Amendment.

In his brief, plaintiff notes that he has significant evidence suggesting that Sheriff Phelps (and, to a lesser extent, his wife) were personally involved in suppressing his First Amendment activities. Specifically, plaintiff writes that:

11

Video footage from the Panola County Courthouse lobby taken on November 6, 2023, shows Defendant Phelps and, upon information and belief, his wife, Circuit Clerk Meek-Phelps, as well during the time that Mr. Parttridge was standing in the Batesville Public Square displaying signs, moving in and out of the lobby and making phone calls. **Ex. B,** video of Panola County Courthouse lobby. Video surveillance also obtained via FOIA request of the Public Square corroborates the timing of the government Defendants' movements with the activities undertaken that day to suppress the Plaintiff's free speech, as do county telephone records.

Telephone records requested by Plaintiff through a FOIA request for Sheriff Phelps's county-issued cell phone show that on November 6, 2023, he made calls to Michael Darby, a Justice Court Judge and friend of the Sheriff, shortly before Judge Darby came out to the Public Square and got into a confrontation with Mr. Parttridge that was captured on video.24 *See also* **Ex. C**, Phone Records. That is, while Mr. Parttridge was protesting the Sheriff's use of his office's resources and connections to harass and intimidate him, the Sheriff was using his resources and connections to further harass and intimidate him. Additionally, video footage obtained from the Panola County Courthouse lobby shows the Sheriff in the lobby and making phone calls; it also shows his wife, Meek-Phelps. Following these telephone calls, Batesville City officials attempted to have Mr. Parttridge and his anti-Phelps signs removed, have him fined, and/or arrested.

[Brief at 25-26].

This court, through its staff, inquired via email with counsel for the parties regarding whether the Justice Court Judge Darby seen in the videos confronting plaintiff during his protest was the same Justice Court Judge who signed various warrants against him. This court was informed by counsel that this was not the case and that "the Plaintiff's cases were handled by the other Justice Court Judge for the County, Mike Wilson." [February 20, 2026 email from counsel]. Accepting this information as accurate, this court still believes that having one of two Panola County Justice Court judges caught on video confronting plaintiff for exercising his First Amendment rights is a "bad look" for that court, and it reduces its confidence in defendants' repeated assertion that the warrants in this case were signed by a "neutral magistrate." Moreover, plaintiff's proof in this case adds to this court's concerns expressed in *Perkins* that a number of Panola County public officials appear to have little respect for the legal boundaries of their positions.

12

In their reply brief, defendants write that:

Again, the November 6, 2023, incident did not lead to the arrest of Parttridge, rather he claims he was told to leave. Nevertheless, because his signs at least arguably violated presumptively valid Mississippi Laws, officers were justified in asking Plaintiff to leave. With regard to any of these Defendants, Plaintiff wholly fails to identify any wrongful conduct but simply claims "the Sheriff and his wife went into action—going in and out of the Panola County Courthouse and making phone calls… the Sheriff contacted the Batesville Mayor and a friend who was a Justice Court Judge, who then came out to the Public Square and confronted Mr. Parttridge." In this regard, it can hardly be argued that Sheriff Phelps' actions were objectively unreasonable in light of clearly established law. Nevertheless, because his signs at least arguably violated presumptively valid Mississippi Laws, officers were justified in asking Plaintiff to leave. It should be noted, while Plaintiff may categorize his actions on November 6, as a political protest, the record would show that his signs included defamatory allegations against private individuals— identifying them by first and last name.

[Reply brief at 9-10](citations omitted).

It thus appears that defendants concede that, at this stage of the proceedings, this court must accept as accurate plaintiff's allegation that Sheriff Phelps was personally involved in suppressing his First Amendment activities on November 6, 2023. This court notes that, based upon the evidence presented to it to date, it would conclude that this was likely the case even if it was *not* required to view the facts in the light most favorable to plaintiff. Defendants assert that any such suppression by Phelps was "at least arguably" in response to violations of "presumptively valid Mississippi laws," but this court explains its disagreement with this assertion in its discussion of qualified immunity issues below.

While this court believes that Sheriff Phelps' alleged actions on November 6 likely constituted a First Amendment violation, it seems clear that these actions, accepted as true for the purposes of this motion, constitute quite damaging evidence as it relates to many of plaintiff's other claims as well. This is partly because of Sheriff Phelps' status as the "final policymaker" for Panola County as it relates to law enforcement activities. This status may well enable plaintiff to surmount the difficult *Monell* barriers to municipal liability as to his claims

13

against Sheriff Phelps in his official capacity, which are properly regarded as claims against Panola County itself. If so, then this would mean that, even if Phelps should prevail on the qualified immunity issues relating to his individual liability, plaintiff will likely still have a viable ground for recovery against the County based on the actions taken by Phelps as Sheriff.

These legal considerations aside, this court believes that Sheriff Phelps' actions on November 6 make it considerably more difficult for defendants to argue that plaintiff's subsequent arrests on December 5, 2023 and December 7, 2023 were the result of a genuine belief that he had committed a crime, as opposed to an attempt to retaliate against him for his First Amendment activities. Moreover, these actions make it much more difficult for Sheriff Phelps to argue that the December 5 and December 7 arrests simply involved citizens filing charges on their own volition and that he was not guiding the process from behind the scenes. Accepting plaintiff's allegations as true, this court believes that Sheriff Phelps had not only demonstrated his retaliatory mindset against plaintiff on November 6, but also his willingness to enlist the help of other Panola County officials in carrying out retaliation on his behalf.

This court submits that Sheriff Phelps' retaliatory mindset towards plaintiff can also be inferred from events which occurred later that same month. Specifically, plaintiff alleges that on November 29, 2023, he posted a video on his YouTube and Facebook pages depicting "video surveillance of his display of signs at the Batesville Public Square and talked through what was happening as it showed the Batesville Mayor, Police Chief, and a Justice Court Judge all interacting with him."[1] [Plaintiff's brief at 12]. In other words, plaintiff reposted his earlier

---

[1] Intriguingly, plaintiff writes in his brief that:

> Plaintiff believes the video is relevant and central to his claims and would like the Court to be able to review it. However, in a Justice Court case, Mr. Parttridge was instructed to remove from his channel and page any references to former Deputy Griffin. Because Mr. Griffin's name appeared on a sign that Mr. Parttridge held in the Batesville Public Square

protests on social media, but in an online format where his First Amendment activities had a much larger potential audience.

It is thus extremely concerning to this court that, on November 30, 2023 - the very next day - the Panola County Sheriff's Department dispatched a lieutenant to take a statement from their former employee Griffin, accusing plaintiff of having, *inter alia*, "held signs up with his name on them calling him the Panola County Goon Squad on November 6, 2023, on the Batesville Public Square." *Id.* To be clear, these are not disputed allegations, but, are, rather, openly conceded in defendants' brief. Specifically, defendants write that:

> ("On November 30,2023 I, Lt Darryl House, was dispatched to Sardis Police Dept in reference to harassment. Upon arrival, Spoke with Josh Griffin. Griffin stated that Jamie Partridge is harassing him because he arrested him a year ago when he was employed by the Panola County Sheriffs Dept. Griffin stated that Partridge is making degrading and insulting comments and accusations about him on social media. Griffin also stated that Partridge held signs up with his name on them calling him the Panola County Goon Squad on November 7, 2023, on the Batesville Public Square."); see MTD 0061-69.

[Defendants' brief at 7, footnote 26].

This court notes that temporal proximity arguments often figure prominently in retaliation lawsuits of all kinds, and the one-day gap between plaintiff's posting of his videos on social media and the dispatching of a Panola County Sheriff's Lieutenant to collect evidence which was later used to arrest him can only be regarded as extremely strong circumstantial evidence in support of his retaliation claims.

---

on November 6, he took the videos down. In order not to violate the Justice Court's instruction, Plaintiff is not attaching the video to his Response to the Defendants' Motion so that it will not be in the public record, but will make it available for the Court's *in camera* review if the Court so desires.
[Plaintiff's brief at 12, footnote 10]. This court does, in fact, have many questions about the video in question, including why such important local public officials were interacting with plaintiff, and to what end. This court does not expect to have answers to questions such as these at the very start of a lawsuit, which is why it believes that further discovery is essential.

15

Soon afterwards, yet another event occurred which, this court believes, buttresses plaintiff's retaliation claims even further. This event involved a December 5, 2023 phone conversation between plaintiff and Sheriff Phelps' wife, Circuit Clerk Melissa Meek-Phelps. It should be recalled that plaintiff alleges that, on November 6, 2023, "the Sheriff and his wife went into action" in response to his First Amendment activities and that video evidence confirms her participation in the events discussed above. Viewing this evidence in the light most favorable to plaintiff, this court believes that the record evidence suggests that Meek-Phelps, much like her husband, was annoyed by plaintiff's First Amendment activities and that she had, on November 6, 2023, already demonstrated an interest in retaliating against him for those activities.

In his brief, plaintiff describes his December 5, 2023 phone call with Meek-Phelps, and his subsequent arrest, as follows:

> Mr. Parttridge was arrested on December 5 [] for alleged telephone harassment of Melissa Meek-Phelps. According to the incident report that led to the arrest, the investigating officer spoke with Meek-Phelps, who told him that she had spoken to Mr. Parttridge when he "called her job (County Clerk office)" during working hours "to ask about a case that PCSO [Panola County Sheriff's Office] was dealing with at the time," and that "when she recognized his voice is when he began to get agitated and began to become irate." Ex. A to MTD at 0081. The report continues, "She stated that he told her that 'this wont be the last you will see of me and everywhere you turn, you will see me.'" *Id.*
>
> The recording of the telephone call, which the Defendants attached to their Motion as an exhibit, at a minimum demonstrates clear genuine issues of material fact as to whether the call provided probable cause for arresting Mr. Parttridge for the crime of Obscene Electronic Communications and, at most, shows that there was no probable cause and any purported harassment or threat to Meek-Phelps was entirely fabricated. As the recording makes clear, when Meek-Phelps answered the phone, she did not identify herself. Ex. C. to MTD. Thus, as far as Mr. Parttridge knew, he could have been speaking to any member of the Circuit Clerk's staff. During the call, and by her own admission, Meek-Phelps recognized his voice and began calling the Plaintiff "Mr. Parttridge," but she never identified herself. *Id.* He never called her by name, only referring to her as "lady"--presumably because he had no way to know with whom he was speaking. *Id.*
>
> Furthermore, at no point in the conversation did Mr. Parttridge make any threat, physical or otherwise. *Id.* Rather, he explained the reason for his call was that he (as his

16

own client) "has a possession of stolen firearms [charge]" and "want[s] to know all I can find out about that," and that the Justice Court had told him to call the Circuit Clerk's office to check and see what information they had on file. *Id.* During the course of the conversation, as he was expressing frustration in attempting to understand why they did not have any information, he stated, "You are very abrasive and I don't put up with that." *Id.* After Meek-Phelps, who had still not identified herself, explained that the Circuit Clerk would only have records if he had been indicted on the charge and that, not having been indicted, there were no records in her office, Mr. Parttridge stated:

> Well, if you don't have an indictment for me, as long as you don't have that, then she [clerk at Justice Court] was just incorrect, but you, lady, are absolutely abrasive, and, look, I'm on—I only asked a question, that's it. So you don't have to do anything else for me; as long as you don't show anything on your record or docket that anything had to do with me, I'm fine. Now you have an absolutely fantastic day. We'll be seeing you guys soon.

> *Id.* At no point in the call does Mr. Parttridge call her an "abrasive bitch" or that "everywhere you turn, you will see me," as she stated in her sworn affidavit, nor did he say anything else that a reasonable person would interpret as being a threat to her safety. With this phone call as her **only** evidence of so-called "harassment" (and while likely ruminating on Mr. Parttridge's vocal public opposition to her husband's re-election as an irritant) Meek-Phelps signed an affidavit that led to his arrest charging him under Miss. Code Ann. § 97-29-45—but only **after** admittedly speaking to a judge and the Sheriff, who spoke to the Batesville Police Department. Ex. A to MTD at 0082-83.

[Plaintiff's brief at 14-16].

Unbeknownst to Meek-Phelps, plaintiff was recording his December 5 phone call with her, and this recording has been submitted as an exhibit in this case. After listening to that recording, this court agrees with plaintiff that the affidavit which Meek-Phelps submitted in support of his arrest included a materially false description of her communications with him, in such a manner as to constitute additional proof of retaliation both on her part and that of her husband (with whom she admittedly consulted prior to filing charges). [Ex. A at 83]. Indeed, this court's impression is that, while plaintiff initially used deception in stating that he was calling on behalf of his "client" (rather than himself) and he appeared to have lost his temper somewhat towards the end of the phone call, there is nothing in that phone call which even remotely rises to the level of criminal misconduct.

17

In their brief, defendants acknowledge that the affidavit signed by Ms. Meek-Phelps included falsehoods, although this court believes that they greatly understate the extent to which this is the case. Specifically, defendants write that:

> The affidavit signed by Ms. Meek-Phelps claimed that Mr. Parttridge did: "willfully and unlawfully by means of telecommunication make an obscene, lewd or lascivious comment with the intent to abuse or threaten a party to a telephone conversation by calling her an abrasive b - - - - and stating that everywhere you go, you will see me" and while the recording may show that he did not call her "an abrasive b - - - -" the audio would nevertheless show that Mr. Parttridge, impersonating an attorney, contacted Melissa Meek-Phelps and stated: "Well you are very abrasive and look I don't put up with that.[…]Okay well you don't have an indictment for me and as long as you don't have that then she was just incorrect, but you lady, are absolutely abrasive and look I only asked you a question[…]We'll be seeing you guys soon." Exhibit C. Recording. Aside from the word 'b - - - -', the recording corroborates the remainder of her written statement and there is nothing in the record to suggest that Ms. Meek-Phelps' fear of Mr. Parttridge is anything but genuine.

[Brief at 36-37].

Defendants thus acknowledge that plaintiff did not actually use the word "bitch" in his December 5, 2023 phone call, as Meek-Phelps falsely asserted. This is significant, since this alleged utterance - which was never actually spoken – appears to buttress an argument that plaintiff violated Miss. Code Ann. § 97-29-45(A), for which he was arrested. This Mississippi statute provides that:

> It shall be unlawful for any person or persons: (a) To make any comment, request, suggestion or proposal by means of telecommunication or electronic communication which is obscene, lewd or lascivious with intent to abuse, threaten or harass any party to a telephone conversation, telecommunication or electronic communication.

Miss. Code Ann. § 97-29-45(A).

As quoted above, defendants insist in their brief that "[a]side from the word 'b - - - -', the recording corroborates the remainder of her written statement," but that is simply not the case. Indeed, this court has reviewed Meek-Phelps' handwritten affidavit, and it strikes it as constituting a considerably more inaccurate description of her phone conversation with plaintiff

18

than defendants concede. In their brief, defendants quote from a written characterization of Meek-Phelps' allegations by a member of the Batesville Police Department, [exhibit A at 85], but, in determining Meek-Phelps' good faith (or lack thereof), her own words in her own affidavit are clearly the relevant evidence to consider, rather than a third party's characterization of what she said.

In her hand-written affidavit, Meek-Phelps appears to have fabricated an additional statement on the part of plaintiff, namely that "you're gonna see me everywhere you look I'm not done with you yet." [Exhibit A at 83]. The recording makes clear that plaintiff simply did not speak these words (or anything close to them), and her false assertion that he did conveniently strengthened the argument that he had violated § 97-29-45(A)'s prohibition against making "threat[s]" and "harass[ing]" the listener via telecommunication. Indeed, it strikes this court that if, during Meek-Phelps' admitted consultations with her husband prior to filing charges, they had discussed what "creative additions" to plaintiff's actual words might be needed to support criminal charges against him, then the result would likely be similar to the allegations in Meek-Phelps' affidavit.

It appears to this court that the closest plaintiff came to making any threat or engaging in any harassment at all can be heard at the end of the recording, when he stated that:

> Well, if you don't have an indictment for me, as long as you don't have that, then she [clerk at Justice Court] was just incorrect, but you, lady, are absolutely abrasive, and, look, I'm on—I only asked a question, that's it. So you don't have to do anything else for me; as long as you don't show anything on your record or docket that anything had to do with me, I'm fine. Now you have an absolutely fantastic day. We'll be seeing you guys soon.

[Recording at 5:00-5:28].

In the court's view, there is nothing in plaintiff's concluding "we'll be seeing you guys soon" which could have reasonably led Meek-Phelps to conclude that he was threatening her

19

personally with violence or harassing her. For starters, "we'll" and "you guys" are each plural, not singular, and a statement that "we'll be seeing you guys soon" cannot reasonably be interpreted as a threat or harassment against her personally. Indeed, this court believes that a reasonable listener would assume, under the circumstances, that his words hinted at a future public protest by someone who was known for such activities, or, perhaps, a civil lawsuit arising out of the November 6, 2023 events. In any event, a threat of violence is completely absent from the actual phone conversation, and Meek-Phelps' affidavit clearly appeared to suggest otherwise. Moreover, plaintiff insists (as quoted above) that he did not even know that he was speaking with Meek-Phelps (as opposed to a member of her staff), and nothing in the recording suggests otherwise.

This court believes that Meek-Phelps' affidavit also hurts her case through her admission that, during the phone call, she recognized his voice as "the voiceover on the YouTube videos being made about Judge Michael Darby and Sheriff Shane Phelps that I have viewed several times." [Exhibit A at 82]. Meek-Phelps thus conceded that she had taken sufficient notice of plaintiff's exercising his First Amendment rights *vis a vis* her husband to have watched his videos "several times." This court believes that a jury could reasonably conclude that it was Meek-Phelps' having taken offense at plaintiff's First Amendment activities critical of her husband which motivated her to file charges against him based upon false information, rather than any genuine fear arising from her phone call with him. In so concluding, this court would note its impression that Meek-Phelps' voice in the recording did not betray any fear that it can discern, but rather a calm disdain or dislike for plaintiff.

Finally, this court notes that defendants concede in their brief that the charges filed by Meek-Phelps (like those filed by Griffin) "were ultimately dismissed," [brief at 8] although they

20

do not appear eager to elaborate on the circumstances surrounding such dismissal. Plaintiff did so in his complaint, however, alleging that:

> 39. On December 7, 2023, Plaintiff appeared in Batesville City Court and presented an audio recording of his December 5, 2023 phone call with Clerk Meek-Phelps that unequivocally demonstrated that her affidavit was false. The recording confirmed that Plaintiff did not use any expletives or make any threats whatsoever toward Clerk Meek-Phelps.
> 40. The supposed fears that Clerk Meek-Phelps expressed in her affidavit were fabricated and completely unreasonable by any objective measure.
> 41. The telephone harassment charge against Plaintiff was dismissed.

[Complaint at 9-10].

Accepting plaintiff's allegations as true, it appears to this court that Meek-Phelps was caught red-handed making materially false allegations against plaintiff, and, that being the case, her continued attempts to frame herself as plaintiff's terrified victim are not at all persuasive to this court. Indeed, filing false criminal charges against another citizen is a very serious matter under any circumstances, and it is particularly reprehensible for one occupying such an important position as Circuit Clerk. This court notes that, in making an inquiry with the Circuit Clerk's office regarding the record of any arrest warrant against him, plaintiff was acting entirely within his rights as a citizen. Moreover, as Circuit Clerk for Panola County, Meek-Phelps was being paid by the taxpayers to respond to such inquiries, and this is not a case where plaintiff, say, made an unsolicited phone call to her home. It is worth noting that, at the start of his phone call, plaintiff told Meek-Phelps that he had been specifically directed to call by the Justice Court, which had no record of any arrest warrant for him and advised him to check with the Circuit Court. [Recording at 0:15-0:25]. This court believes that, under these circumstances, Meek-Phelps had no reason to suspect that plaintiff was calling in order to threaten or harass her personally, but was, instead, making an entirely valid inquiry – upon the explicit advice of the Justice Court - regarding the existence of any arrest warrant against him.

21

This court reiterates that, in his complaint, plaintiff alleges that:

30. Clerk Meek-Phelps' and Sheriff Phelps initially sought to charge Plaintiff with making terroristic threats, a felony, but they were advised against it.
31. Clerk Meek-Phelps' and Sheriff Phelps' settled on filing a misdemeanor telephone harassment charge against Plaintiff.

[Complaint at 8]. If the evidence supports plaintiff's assertion that Meek-Phelps and her husband originally sought to file felony charges against him for making "terroristic threats" then, having listened to the rather innocuous phone call itself, this court believes that this would constitute outrageous misconduct. This court has had occasion to witness, both in this case and *Perkins*, numerous instances in which public officials in Panola County appear to have used their positions for untoward ends, which leads it to wonder: what exactly is going on in Panola County? Indeed, for all his apparent shortcomings as a human being, a central focus of plaintiff's online activities appears to be directed at what he regards as abuses of authority among local officials in Panola County, and, based on what this court has observed in its courtroom, it is unable to state that he is off-base in doing so.

As an addendum of sorts to these issues, this court takes judicial notice of an online article in the Panolian newspaper dated December 11, 2023, i.e. mere days after the events discussed above. This article is entitled "Meek-Phelps says drama became too much to continue; will work with appointee for smooth transition" and states that:

Following the resignation announcement of Circuit Clerk Melissa Meek-Phelps at Monday morning's meeting of the Panola County Board of Supervisors, a few details about how the county will proceed were discussed. Meek-Phelps also gave some insight about what is technically not a resignation, but an announcement that she will not be taking the oath of office for the seat to which she was elected by a landslide in November. It was her fourth straight election win. Her husband, Shane Phelps, in the same election won an overwhelming second term as Sheriff. At the close of the regular board meeting at the Batesville Courthouse, board president was about to ask for a vote for the supervisors to enter executive session when Meek-Phelps entered the room and passed out a letter to each board member, the county attorney, and newspaper editor.

22

The letter is as follows: "I, Melissa Meek-Phelps, the current Circuit Clerk, after much consideration has decided that I will not be accepting the oath of office for the new 2024-28 term of office. It has been an honor and a privilege serving the wonderful people of this great county. I have worked relentlessly to assist and help in every possible way, and serve everyone in a fair and integral manner. I will be happy to assist in any way to help with a smooth transition, especially due to the fast approaching Federal Election.[2]

This court does not believe that this (apparent) resignation impacts upon its analysis of this case, but it wishes to note it in the interests of being thorough.

This court now turns to defendants' motion to dismiss some of plaintiff's specific claims in this case. While this court wishes to wait until the completion of discovery before ruling on some of them, it does agree with defendants that certain claims should be dismissed now. This court agrees with defendants, for example, that certain claims which are based on events which occurred on before November 4, 2021 are barred by applicable statutes of limitations, and plaintiff does not appear to dispute this point. This court further finds that, in his brief, plaintiff has failed to adequately respond to defendant's arguments relating to misconduct which allegedly occurred on December 3, 2021 and July 22, 2022, [defendants' brief at 22-23] and it concludes that that these claims, while timely, should be dismissed. It appears that plaintiff has chosen to focus on his claims which arose on and after November 6, 2023, and this court regards this decision as a wise one. In light of this decision, however, his claims arising before that date will be dismissed.

In their brief, defendants assert that:

The most recent alleged wrongful act occurred on December 7, 2023; without giving the notice required by Miss. Code Ann.§ 11-46-11, Plaintiff filed his complaint on November 4, 2024. Thus, to the extent he alleges any claims under the MTCA, those

---

[2] https://panolian.com/2023/12/11/meek-phelps-says-drama-became-too-much-to-continue-will-work-with-appointee-for-smooth-transition/

claims are now barred by the one-year statute of limitations period provided in § 11-46-11. See *Brown v. Sw. Miss. Reg'l Med. Ctr.,* 989 So. 2d 933, 936-37 (Miss. App. 2008) (The Court of Appeals concluded: "we only look to whether Brown strictly complied with the provisions of section 11-46-11(1)…[b]ecause Brown failed to comply with the ninety-day waiting period, his case must be dismissed."); *See also Id.* at pg. 938 ("Brown's compliance with section 11-46-11(1) must have been to the letter of the law."). To the extent any state law claims arising out of incidents prior to November 4, 2023 are not covered by the MTCA, they are barred by the one-year limitations period provided in Miss. Code Ann. § 15-1-35, which establishes a one-year limitations period for certain intentional torts, including assault and battery, false imprisonment, malicious arrest, and menace." *Atwood*, 312 F. Supp. 3d at 565 n.7. (emphasis added). *See Burnett v. Hinds Cty.*, 313 So. 3d 471, 477 (Miss. 2020) ("The MTCA tolling provisions do not apply to claims outside the MTCA.").

It follows, the only state law claims remaining as against any of these defendants must proceed against them individually, and must arise out of either the November 6, 2023 incident, the December 5, 2023 arrest, or the December 7, 2023 arrest. However, as discussed in detail below, with regard to these defendants, any potential state law claims arising out of either the November 6, 2023, December 5, 2023, or December 7, 2023 incidents fail as a matter of law.

[Reply brief at 4-5].

This court agrees with all but the last sentence of this argument. Specifically, this court agrees with defendants that any state law claims which are subject to the MTCA are barred by plaintiff's failure to comply with the notice of claim provisions in that Act, which he appears to tacitly concede in his briefing. This court further agrees with defendants that this leaves as potential state law claims only those which fall outside of the scope of the MTCA, which must proceed against any defendants individually and which all appear to be subject to a one-year statute of limitations. *See Zumwalt v. Jones Cnty. Bd. of Sup'rs*, 19 So. 3d 672, 688 (Miss. 2009)(Under § 11–46–5(2), torts in which malice is an essential element "are not within the course and scope of employment … these intentional torts are outside the scope of the MTCA's waiver of immunity, and the MTCA does not apply.")

This court believes that the most obvious candidate for such a malice-based tort is a malicious prosecution action, which the Mississippi Supreme Court has held to be an available

remedy outside the scope of the MTCA and which plaintiff asserts in his complaint. *Univ. of Mississippi Med. Ctr. v. Oliver*, 235 So. 3d 75, 82 (Miss. 2017); Complaint at 17. Unlike defendants, however, this court is unable to conclude that any such malicious prosecution claim would lack merit, to the contrary, it arguably fits quite nicely with what, plaintiff alleges, took place in this case. This court accordingly declines to dismiss plaintiff's state law malicious prosecution claims against Meek-Phelps and Phelps at this time, and it will allow discovery to proceed on this claim.

**Claims against defendant Griffin**

This court will likewise allow discovery to proceed on plaintiff's state law malicious prosecution claims against defendant Griffin, but it concludes that plaintiff's federal claims against this defendant arising out of his November, 2021 shooting must be dismissed. In so stating, this court notes that plaintiff filed his November 4, 2024 complaint two days too late to cover the 2021 shooting, under the three-year statute of limitations applicable to § 1983 claims in this state.

Plaintiff's federal claims against Griffin arising out of the December 7, 2023 criminal charges are well within the statute of limitations, but there is a complicating factor which this court will address on its own motion. The parties agree that Griffin was no longer a deputy, and was in fact a private citizen, at the time he filed his charges against plaintiff in December 2023. This is significant, since § 1983 normally only applies to actions taken under "color of state law," and the Fourteenth Amendment (and thus the First and Fourth Amendments incorporated against the states thereby) do not apply to private conduct. *See United States v. Morrison*, 529 U.S. 598, 621 (2000)(the "provisions of the Fourteenth Amendment have reference to State action exclusively, and not to any action of private individuals.' ").

25

In reviewing this case, this court initially wondered whether § 1983 and the Fourteenth Amendment would cover the actions of Griffin which were committed while he was a private citizen. In researching this issue, this court discovered authority holding that a private party's joint participation with a state official in a conspiracy to discriminate would constitute both "state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights" and action " 'under color' of law for purposes of the statute." *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1604 (1970). Both sides appear to assume in their briefing that Griffin might face potential liability under § 1983, but, in light of *Adickes*, it appears to this court that the truth may be a bit more complex than that. That is to say, it appears to this court that plaintiff would be allowed to recover against Griffin under § 1983, but only to the extent that plaintiff alleges that Griffin acted in concert with Sheriff Phelps, and not on his own.

Fortunately for plaintiff, he does allege a conspiracy among defendants to violate his constitutional rights, and he is able to point to helpful facts in this regard, such as the fact that one of Sheriff Phelps' lieutenants was dispatched to take a report from Griffin soon after plaintiff posted videos on social media which were critical of Phelps. Additionally, the fact that these defendants were, at one time, members of the same Sheriff's department clearly assists plaintiff in alleging joint action between them. Thus, while this court ultimately concludes that the parties were correct in briefing the claims against Griffin in terms of § 1983, it wishes to address the legal framework of this issue in the interest of being thorough.

The fact that Griffin was a private citizen at the time he filed his criminal complaint is significant in another respect: the U.S. Supreme Court has held that private citizens may not

26

assert a qualified immunity defense.  Specifically, the U.S. Supreme Court wrote in *Wyatt v. Cole* that:

> Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting government's ability to perform its traditional functions. Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service. In short, the qualified immunity recognized in *Harlow* acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.  These rationales are not transferable to private parties. Although principles of equality and fairness may suggest, as respondents argue, that private citizens who rely unsuspectingly on state laws they did not create and may have no reason to believe are invalid should have some protection from liability, as do their government counterparts, such interests are not sufficiently similar to the traditional purposes of qualified immunity to justify such an expansion.

*Wyatt v. Cole*, 504 U.S. 158, 167–68, 112 S. Ct. 1827, 1833 (1992).

This court notes that, in this case, Griffin is a private citizen who is essentially arguing that, by filing charges against plaintiff under § 97-29-45(A), he "rel[ied] unsuspectingly on state laws [he] did not create and [had] no reason to believe [were] invalid."  *Wyatt*, 504 U.S. at 168. *Wyatt* makes it clear that this is insufficient to allow him to assert a qualified immunity defense, since, the Supreme Court found, that doctrine was created to safeguard government and not its agents.  *Id.*

Consistent with this precedent, the portions of defendants' initial and reply briefs dealing with Griffin include no mention of qualified immunity [initial brief at 38-41, reply brief at 14-19], and the concluding sections of both briefs specifically assert that "individual defendants, Panola County Court Clerk, Ms. Meek-Phelps; and Sheriff Phelps are shielded from liability by the doctrine of qualified immunity" with no mention of Griffin asserting that defense. [Initial brief at 40, reply brief at 22].  It thus seems clear that defendants recognize that Griffin, as a private citizen, is not entitled to assert a qualified immunity defense, and this means that

27

*Carswell* does not apply to the claims against him. This means, in turn, that this court has the discretion to do what it would prefer to do anyway: allow discovery to proceed regarding the claims against Griffin before it determines whether he might have committed a constitutional violation in this case.

In this vein, this court notes that it lies in the inherent nature of conspiracies that they are usually opaque to the outsider, and it does not believe that it is reasonable to expect plaintiff to know, at the very start of the lawsuit, what events "behind the scenes" led to the filing of the December 7 charges against him by Griffin. This is the sort of evidence that often eludes even the discovery process, but this court concludes that plaintiff should at least be given a chance to try to obtain any evidence in this regard before it considers the merits of his claims against Griffin. This court therefore concludes that plaintiff's claims against Griffin arising out of the November 2, 2021 shooting incident should be dismissed on statute of limitations grounds, but it will reserve judgment upon plaintiff's federal and state claims arising out of the December 7, 2023 criminal charge until after discovery has been performed.

Waiting to decide the issues involving Griffin's liability until after discovery will also give both sides a chance to, if necessary, submit an amended complaint or, in the case of defendants, new summary judgment arguments that, as a private citizen, Griffin is not subject to a § 1983 action. This court notes that, after emailing the parties regarding its concerns on this issue, counsel for defendants submitted arguments in email indicating that they now believe that Griffin, as a private citizen, is not subject to liability under § 1983, even though their briefing clearly appeared to assume otherwise. [*See* defendants' brief at 39-40]. This court recognizes that these are difficult issues, and it does not intend to play "gotcha" with either side on them. It appears that both sides would be well advised to fine tune their complaints and summary

28

judgment arguments to address these new issues raised by this court on its own motion, and its ruling today gives them an opportunity to do so.

### Qualified immunity defenses raised by Phelps and Meek-Phelps

That brings this court to what is, in many ways, the "main event" in the instant motion: the qualified immunity defenses raised by Sheriff Phelps and his wife Meek-Phelps. Here too, this court would prefer to defer ruling until after discovery, but its discretion to do so is greatly limited by *Carswell*. This court will accordingly consider the qualified immunity issues now, and, in doing so, it will consider the defenses raised by Phelps and Meek-Phelps together. This seems appropriate, since plaintiff alleges that both of these defendants participated in the November 6, 2023 efforts to suppress his First Amendment activities, and he alleges that they both conspired to file the December 5, 2023 criminal charge against him based upon a false account of his phone conversation with Meek-Phelps. After considering the evidence discussed above, this court does not regard either of these as being unreasonable allegations.

This court reiterates that both sides have pushed the limits of a Rule 12 motion, and it appears that this motion presently finds itself in hybrid Rule 12/Rule 56 territory. Even if this order is properly considered a ruling on a Rule 56 summary judgment motion, its ruling today denying defendants' qualified immunity motion will be without prejudice to defendants filing another qualified immunity motion after the completion of discovery. This is consistent with this court's belief that the litigation process should be a search for the truth, and regardless of which side that search happens to benefit, this court will not prevent them from using its results in a renewed motion. With this caveat, this court will proceed to the merits of defendants' qualified immunity motions.

It is well established that a defendant who "pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion" thereby places the burden on the plaintiff to "rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997). "The plaintiff bears the burden of negating the defense and cannot rest on conclusory assertions, but must demonstrate genuine issues of material fact regarding the reasonableness of the official's conduct." *Gatson v. Winston County, Miss.*, 2014 WL 585810, at *5 (N.D. Miss. 2014)(internal citations omitted). To rebut a qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident. *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008).

In *Plumhoff v. Rickard*, 572 U.S. 765, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014), the Supreme Court upheld a qualified immunity defense on the basis of the "clearly established" prong, emphasizing that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 563 U.S. [731] 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate."

*Plumhoff*, 134 S.Ct. at 2023.

In ruling upon the qualified immunity issues in this case, this court incorporates its prior discussions of the November 6 and December 5 incidents, and, having done so, it does not believe that a great deal of elaboration is required to explain its conclusion that plaintiff has managed to meet the first prong of the qualified immunity test, relating to the allegation of the

30

existence of a constitutional violation. That is, this court does not believe that it needs to explain in any depth why allegations that Phelps and Meek-Phelps sought to rally high-level municipal officials to hinder him from expressing his political views in posters which he carried on public sidewalks the day before election day, properly alleges a violation of his First Amendment rights. Likewise, this court regards it as quite obvious why, if plaintiff's allegation that Phelps and Meek-Phelps engaged in a further act of retaliation by filing baseless criminal charges against him, based on facts which they knew to be false, is accurate, then that would likewise constitute a violation of his First Amendment and/or Fourth Amendment rights.

As is generally the case with qualified immunity motions, it is the second prong – the "clearly established" prong – which constitutes the more difficult obstacle here, but this court believes that plaintiff is able to surmount it with regard to both the November 6, 2023 and December 5, 2023 incidents. With regard to the November 6 incident, this court emphasizes that Phelps and Meek-Phelps are alleged to have engaged in a prior restraint of plaintiff's political speech, based upon their having taken offense at its content. That alone is sufficient to bring this case in rarified First Amendment air. Indeed, it is well settled that "[a]ny prior restraint on expression comes with a 'heavy presumption' against its constitutional validity." *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968). Moreover, the U.S. Supreme Court has also made it clear that:

> Because content-based laws target speech based on its communicative content, they are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. *E.g., R.A.V. v. St. Paul,* 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305. Speech regulation is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. *E.g., Sorrell v. IMS Health, Inc.,* 131 S.Ct. 2653, 2663–2664, 180 L.Ed.2d 544 (2011).

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 155, 135 S. Ct. 2218, 2222 (2015).

This court regards it as a testament to the strength of plaintiff's First Amendment claims that, to the two important circumstances above, he is able to add multiple others which bring this case into even more rarified First Amendment air. One of these circumstances lies in the fact that plaintiff made his protests on public sidewalks in downtown Batesville. This is significant, since the Supreme Court has long recognized such locations as being entitled to particularly strong First Amendment protection. In this vein, the U.S. Supreme Court has written that:

> By its very terms, the Massachusetts Act regulates access to "public way[s]" and "sidewalk[s]." Such areas occupy a "special position in terms of First Amendment protection" because of their historic role as sites for discussion and debate. *United States v. Grace,* 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). These places— which we have labeled "traditional public fora"—" 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Pleasant Grove City v. Summum,* 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009).
>
> It is no accident that public streets and sidewalks have developed as venues for the exchange of ideas. Even today, they remain one of the few places where a speaker can be confident that he is not simply preaching to the choir. With respect to other means of communication, an individual confronted with an uncomfortable message can always turn the page, change the channel, or leave the Web site. Not so on public streets and sidewalks. There, a listener often encounters speech he might otherwise tune out. In light of the First Amendment's purpose "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail," *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 377, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (internal quotation marks omitted), this aspect of traditional public fora is a virtue, not a vice.

*McCullen v. Coakley*, 573 U.S. 464, 476, 134 S. Ct. 2518, 2528–29 (2014).

If these considerations were somehow not enough, plaintiff is able to cite in his favor the additional fact that his speech advocated against a political candidate and in favor of another. On this subject, the U.S. Supreme Court has written that:

> "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'

32

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346, 115 S. Ct. 1511, 1518 (1995)(citation

omitted).  The Supreme Court has likewise stated that:

> In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 [91 S.Ct. 621, 625, 28 L.Ed.2d 35] (1971), 'it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' " *Buckley v. Valeo*, 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam).

*McIntyre*, 514 U.S. at 346.  The Supreme Court thus made it clear that "the constitutional

guarantee has its fullest and most urgent application precisely to the conduct of campaigns for

political office," *Buckley*, 424 U.S. at 14, and to this urgency, plaintiff is able to add the fact that

his speech came at a particularly urgent time – the day before election day.

This court believes it is at this point, if not sooner, that, if this question were a boxing

match, it would be stopped by the referee.  This court submits that, in light of the overwhelming

Supreme Court authority quoted above, which is all very clearly established, there is no

reasonable argument that a county official in the position of Phelps or Meek-Phelps could have

believed that they had a right to suppress plaintiff's speech in the manner in which plaintiff

alleges occurred on November 6, 2023.  Indeed, this court believes that, even without being a

Constitutional scholar, anyone who attended a basic high school civics class should have known

that they were doing something profoundly un-American in attempting to censor such speech.

In his brief, Phelps suggests that he had a right to act to protect a private citizen- former

Deputy Griffin – from what he regarded as the defamatory statement that he was a member of a

"Goon Squad."  This court notes that, while Griffin was, in fact, a private citizen on November 6,

2023, he had previously been a Deputy Sheriff, which arguably renders plaintiff's accusation a

matter of public interest.  That aside, even if Sheriff Phelps had the constitutional right to prevent

speech regarding private individuals which he deemed to be defamatory - and this court seriously doubts that he did - the requirement that any such suppression be "narrowly tailored" would almost certainly limit Phelps' potential recourse to crossing out the names of any such private individuals on plaintiff's placards and leaving the speech critical of himself intact. This court frankly doubts that Sheriff Phelps could even take this limited step, since defamation law provides a legal recourse for any private individuals who feel that they have been defamed. That being the case, this court can discern no reason why it falls within a county Sheriff's lawful authority to serve as the judge, jury and executioner regarding speech which he regards as defamatory towards private third parties.

In seeking to justify his actions, Phelps also cites two Mississippi statutes, the first of them being Miss. Code Ann. § 23-15-875. This statute provides that:

> No person, including a candidate, shall publicly or privately make, in a campaign then in progress, any charge or charges reflecting upon the honesty, integrity or moral character of any candidate, so far as his or her private life is concerned, unless the charge be in fact true and actually capable of proof; and any person who makes any such charge shall have the burden of proof to show the truth thereof when called to account therefor under any affidavit or indictment against him or her for a violation of this section. Any language deliberately uttered or published which, when fairly and reasonably construed and as commonly understood, would clearly and unmistakably imply any such charge, shall be deemed and held to be the equivalent of a direct charge.

*Id.*

> Phelps also cites Miss. Code Ann. § 23-15-895, which provides that:

> No candidate for an elective office, or any representative of such candidate, and no proponent or opponent of any constitutional amendment, local issue or other measure printed on the ballot may post or distribute cards, posters or other campaign literature within one hundred fifty (150) feet of any entrance of the building wherein any election is being held. No candidate or a representative named by him or her in writing may appear at any polling place while armed or uniformed, or display any badge or credentials except as may be issued by the manager of the polling place. As used in this section, the term "local issue" shall have the meaning ascribed to such term in Section 23-15-375. This section shall be enforced by election officials and law enforcement officials.

34

*Id.*

In addressing these state statutes, this court would note, first and foremost, that the issue in the qualified immunity context is whether the defendant violated clearly established *federal*, not state law. In *Howlett v. Rose*, 496 U.S. 356, 376–77, 110 S. Ct. 2430, 2443 (1990), the U.S. Supreme Court made it clear that state law cannot immunize that which is made unlawful by federal law, writing that:

> In *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), we unanimously concluded that a California statute that purported to immunize public entities and public employees from any liability for parole release decisions was pre-empted by § 1983 "even though the federal cause of action [was] being asserted in the state courts." *Id.,* at 284, 100 S.Ct., at 558. We explained:
>> " 'Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced. See *McLaughlin v. Tilendis,* 398 F.2d 287, 290 (7th Cir.1968). The immunity claim raises a question of federal law.' *Hampton v. Chicago,* 484 F.2d 602, 607 (CA7 1973).
> In *Felder v. Casey,* we followed *Martinez* and held that a Wisconsin notice-of-claim statute that effectively shortened the statute of limitations and imposed an exhaustion requirement on claims against public agencies and employees was pre-empted insofar as it was applied to § 1983 actions. * * * "The decision to subject state subdivisions to liability for violations of federal rights ... was a choice that Congress, not the Wisconsin Legislature, made, and it is a decision that the State has no authority to override." *Id.,* at 143, 108 S.Ct., at 2309.

*Howlett*, 496 U.S. 376–77.

In light of this authority, it does not appear to this court that the Mississippi statutes cited by Phelps are relevant at all. Assuming purely for the sake of argument that they are, this court is unpersuaded by Phelps' argument that they offer him any kind of defense. In his brief, Phelps submits that these statutes "at least arguably" supported his actions, but he offers no actual arguments explaining how this is the case. This court notes that nothing in § 23-15-875 grants a Mississippi Sheriff the authority to make a prior restraint of speech critical of a political

35

candidate and, if it did, it would be blatantly unconstitutional.  It seems clear that § 23-15-875 deals with post-expression remedies for allegedly offending speech, stating that the speaker "shall have the burden of proof to show the truth thereof when called to account therefor under any affidavit or indictment against him or her for a violation of this section."  While this court regards even this language as being constitutionally suspect,[3] it clearly does not grant a Mississippi sheriff the authority to engage in a prior restraint of political speech on a public sidewalk.

As far as Miss. Code Ann. § 23-15-895, it strikes this court that the statute is plainly inapplicable to plaintiff, who was not a "candidate for an elective office, or any representative of such candidate," nor was he a "proponent or opponent of any constitutional amendment, local issue or other measure printed on the ballot."  Moreover, defendants provide no arguments explaining how plaintiff was "post[ing] or distribut[ing] cards, posters or other campaign literature within one hundred fifty (150) feet of any entrance of the building wherein any election is being held" within the meaning of the statute.  Finally, it would be absurd to argue that, in seeking to remove plaintiff's protest signs which were highly critical of him, Sheriff Phelps (and

---

[3] The U.S. Supreme Court has held that:

The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 726 (1964).  While § 23-15-875 relates to "any charge or charges reflecting upon the honesty, integrity or moral character of any candidate, so far as his or her private life is concerned," this language strikes this court as exceedingly vague and overbroad.  Moreover, this court reiterates the U.S. Supreme Court's holding that the "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor*, 401 U.S. at 271–272.  This court doubts that § 23-15-875 would survive scrutiny under *Monitor*, but this issue is largely immaterial since the statute did not authorize Sheriff Phelps' actions in this case.

36

his wife) were concerned with their proximity to a polling place, rather than their content. This court therefore concludes that defendants' qualified immunity motion lacks merit with regard to plaintiff's claims arising out of the November 6, 2023 protest.

This court now turns to defendants' qualified immunity motion as it relates to plaintiff's claims arising out of the December 5, 2023 phone conversation and subsequent arrest. This court believes that much of the foregoing First Amendment authority also applies to the December 5 events, with the caveat that plaintiff alleges that the baseless charges filed against him were an after-the-fact retaliation for his First Amendment activities on November 6 (and similar activities online), rather than an attempt to censor them. As to this December 5 claim, plaintiff is able to add powerful additional evidence, in the form of the audio evidence, discussed above, which clearly creates fact issues regarding whether Meek-Phelps, in consultation with her husband, deliberately lied about her phone conversation with plaintiff in order to obtain an arrest warrant against him. Clearly established Fifth Circuit authority supports the right of § 1983 plaintiffs to recover against state officers under such circumstances.

In *Winfrey v. Rogers,* 901 F.3d 483 (5th Cir. 2018), for example, the Fifth Circuit described the law applicable to the obtaining of warrants based on what is known to be false information as follows:

> Since *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), it has been clearly established that a defendant's Fourth Amendment rights are violated if (1) **the affiant, in support of the warrant, includes "a false statement knowingly and intentionally, or with reckless disregard for the truth"** and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 155–56, 98 S.Ct. 2674. In *Franks*, the Supreme Court observed that the warrant requirement is meant "to allow the magistrate to make an independent evaluation of the matter." *Id.* at 165, 98 S.Ct. 2674. It requires affiants to "set forth particular facts and circumstances underlying the existence of probable cause," including those that concern the reliability of the information and the credibility of the source to avoid "deliberately or reckless false statement[s]." *Id.*
>
> Still, "negligence alone will not defeat qualified immunity." *Brewer*, 860 F.3d at 825. **"[A] proven misstatement can vitiate an affidavit only if it is established that**

37

> **the misstatement was the product 'of deliberate falsehood or of reckless disregard for the truth.' "** *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980) (quoting *Franks*, 438 U.S. at 171, 98 S.Ct. 2674). Recklessness requires proof that the defendant " 'in fact entertained serious doubts as to the truth' of the statement." *Hart v. O'Brien*, 127 F.3d 424, 449 (5th Cir. 1997).

*Winfrey*, 901 F.3d at 494–95 (emphasis added).

Similarly, the Fifth Circuit in *Hale v. Fish*, 899 F.2d 390 (5th Cir. 1990) concluded that an affidavit supporting an aggravated kidnapping arrest warrant contained misstatements and critical omissions sufficient to amount to constitutional violation and to support damages verdicts against two FBI agents (Jones and Magee) who were responsible for the affidavit. In explaining why neither of these two agents were entitled to qualified immunity, the Fifth Circuit wrote that:

> In the present case, Major Jones submitted an affidavit **found by the district court to contain material misstatements and omissions of such character that no reasonable official would have submitted it to a magistrate**. As this finding is supported by the record, the court did not err in denying qualified immunity to Major Jones.
> Special Agent Magee contends that the district court erred in denying him qualified immunity under either an active participant theory or a conspirator theory. * * *
> **What Special Agent Magee fails to consider is the evidence demonstrating his knowledge of exculpatory information**; although his is a closer case than with Major Jones, it is likely that a reasonable officer having the information possessed by Special Agent Magee during the events at issue would have known that his conduct in assisting Major Jones in the plaintiffs' arrest would have been a violation of the Fourth Amendment. Consequently, the district court did not err in denying qualified immunity to Special Agent Magee.

*Hale v. Fish*, 899 F.2d at 402 (emphasis added).

In his brief, plaintiff cites *Hart v. O'Brien*, another in the line of Fifth Circuit case law on this issue, where that court noted that:

> The Supreme Court in *Franks v. Delaware* established that a search violates the Fourth Amendment if it was conducted pursuant to a warrant issued by a magistrate who was misled by information in an affidavit, provided that the affiant knew the information was false or would have known it was false except for his reckless disregard for the truth.

*Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997)(overruled on other grounds by *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997)). Significantly for Sheriff

38

Phelps' potential liability, the Fifth Circuit in *Hart* made it clear that individuals other than the actual affiant may be held liable in this context, writing that:

> We agree with the reasoning of these circuit courts that a deliberate or reckless misstatement may form the basis for a *Franks* claim against a government official who is not the affiant. "The Fourth Amendment places restrictions and qualifications on the actions of the government generally, not merely on affiants." A governmental official violates the Fourth Amendment when he deliberately or recklessly provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit.

*Hart*, 127 F.3d at 448–49(citation omitted).

*Franks,* as applied by the Fifth Circuit in *Winfrey, Hale* and *Hart*, clearly support the right of § 1983 plaintiffs to recover against officers who lie or who recklessly make material misstatements in affidavits while seeking an arrest warrant. In this case, there are clearly fact issues regarding whether Meek-Phelps deliberately lied or recklessly made material misrepresentations in her affidavit, with full knowledge that plaintiff never actually said the most damaging quotes which she attributed to him. Furthermore, this court concludes that the second part of the *Franks* test is met as well since, if Meek-Phelps had omitted the false statements in her affidavit, then she would have merely described a fairly routine phone conversation which by no stretch of the imagination would support criminal charges. Finally, given the evidence of Phelps' prior history of retaliating against plaintiff for his First Amendment activity, and the fact that he and his wife consulted prior to filing the December 5 charges, there are likewise fact issues regarding whether Phelps participated in the decision to misrepresent what plaintiff had actually said in his phone call in order to have him arrested.

Assuming purely for the sake of argument that the aforementioned authority is held not to apply to Meek-Phelps because she was a circuit clerk, rather than a police officer, then this court would conclude that the "obvious case" exception set forth in *Hope v. Pelzer*, 536 U.S. 730

39

(2002) nevertheless applies. In so stating, this court would make the (hopefully non-controversial) observation that no governmental official, whether she is a police officer or not, could believe that they have a right to file criminal charges against another citizen based upon known lies. This court therefore concludes that plaintiff properly alleges, and there presently exist fact issues regarding whether, defendants violated each prong of the qualified immunity standard, as it relates to the December 5 events.

In their brief, defendants cite case law which is applicable to claims against officers who conducted an arrest, [brief at 20], but it seems clear that plaintiff's claims in this case are *Franks/Winfrey/Hale/Hart* claims based upon allegations that Meek-Phelps knowingly lied in submitting affidavits in support of an arrest warrant. It simply cannot be the case that government officials are permitted to lie with impunity in order to have an innocent citizen arrested, and the decisions discussed above clearly establish that they are not. While it may be the case that plaintiffs' claims in this regard are properly analyzed in the context of the Fourth, rather than the First, Amendment, the crucial fact remains: obtaining an arrest warrant for a citizen based upon a knowing lie or reckless misstatement in an affidavit is contrary to clearly established federal law.

In his complaint, plaintiff clearly alleges a Fourth Amendment *Franks* claim based on "submitting false affidavits to obtain warrants," [complaint at 11], and assuming for the sake of argument that it becomes necessary for him to flesh out the allegations of his complaint even further, then the liberal amendment rules set forth in Fed. R. Civ. P. 15 clearly authorize this. At times in their briefing, defendants appear to suggest that § 1983 plaintiffs are required to submit an absolutely flawless complaint on their first try, barring which the action is dismissed. That is not the law, and this court's impression is that the complaint in this case was

drafted with considerable care and is well above average among § 1983 complaints it has reviewed. Moreover, while defendants argue in terms of whether probable cause existed to arrest plaintiff, such probable cause would only arguably have existed based on material falsehoods in the affidavit submitted by Meek-Phelps. This is confirmed by the fact that, once the judge in question heard the actual recording of what plaintiff said, he dismissed the charge against him.

This court notes that, in this case, plaintiff not only alleges a deliberate falsehood by Meek-Phelps in including false information in her affidavit, but the extensive history of "bad blood" between the parties renders these allegations much more plausible than if they were strangers to one another. In the court's view, this history makes it much less likely that, in submitting her affidavit, Meek-Phelps simply "mis-remembered" what plaintiff had told her, instead of deliberately putting her thumb on the scale. Plaintiff's allegations (and proof) of deliberate falsehoods in Meek-Phelps' affidavit also defeat defendants' attempts to rely upon the so-called "independent intermediary doctrine" since that doctrine only applies "where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information from the independent intermediary." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010), *citing Hand v. Gary,* 838 F.2d 1420, 1428 (5th Cir.1988). In this vein, the Fifth Circuit has written that:

> The independent-intermediary doctrine provides that **"if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party."** *Anokwuru v. City of Hous.*, 990 F.3d 956, 963 (5th Cir. 2021) (internal quotation marks and citations omitted), *abrogated on other grounds by Guerra*, 82 F.4th 278. However, **"[a]n officer can still be liable if the officer deliberately or recklessly provides false, material information for use in an affidavit *or makes knowing and intentional omissions* that result in a warrant being issued without probable cause."** *Id.* at 964 (emphasis added) (citations omitted); *see also Winfrey*, 901 F.3d at 494; *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020).

41

*Bledsoe v. Willis*, 2023 WL 8184814, at *4 (5th Cir. 2023)(emphasis in original). Clearly, the allegations and proof in this case implicate this exception to the independent intermediary doctrine, and this court therefore finds that doctrine inapplicable here.

In their reply brief, defendants write that:

> Plaintiff spends much of his brief arguing that there is a question of material fact as to whether the call could be deemed threatening. The problem with this, however, is a neutral magistrate found that the statements were threatening, thus insulating Meek-Phelps, Sheriff Phelps, and all other named parties from liability under the independent-intermediary doctrine. In *Buehler v. Dear*, the 5th Circuit noted,
>> All of the affidavit's claims to which Buehler objects either were substantially accurate, were "not material to the [magistrate's] findings of probable cause," or were merely "different interpretations" of events on which "[t]here [wa]s plainly room to disagree." And an affiant's presentation of one plausible "version of . . . disputed facts to the magistrate judge" does not taint the resulting warrant. *Buehler v. Dear*, 27 F.4th 969, 991-92 (5th Cir. 2022) (*internal citations omitted*).

[Reply brief at 12]. In the court's view, defendants' own quotation from *Bueller* demonstrates its inapplicability to this case, since, in that case, the Fifth Circuit made clear that "[a]ll of the affidavit's claims to which Buehler objects either were substantially accurate, were "not material to the [magistrate's] findings of probable cause," or were merely "different interpretations" of events on which "[t]here [wa]s plainly room to disagree." *Id.* As discussed above, it appears to this court that the allegations of Meek-Phelps' affidavit which were most material to plaintiff's arrest were demonstrably false based on the actual recording of her conversation with plaintiff.

This court is also unpersuaded by defendants' attempt to characterize the exact starting date of any conspiracy against plaintiff as a material issue in this case. Specifically, defendants argue that:

> While it is true that Plaintiff was arrested for sending obscene electronic communications on both December 5, and 7, of 2023, the record would show that the December 7, 2023, arrest was not based on the Affidavit of Circuit Clerk Meek-Phelps, which was submitted in the Batesville Municipal Court, nor was it the product of some elaborate conspiracy concocted on December 5, 2023, as alleged in the complaint. Rather, the December 7,

> 2023 arrest was caused by a warrant issued by the Panola County Justice Court and based
> on: 1) the statement and affidavit of Josh Griffin - dated November 30, 2023 and
> December 1, 2023 respectively; and (2) the statement of Lindsey O'Conner - dated
> December 4, 2023 and December 6, 2023, respectively, and thus could not have been the
> product of the alleged plan concocted on December 5, 2023.

[Reply brief at 14-15]. This court regards this as a rather weak attempt at a "gotcha" moment,

since, legally speaking, it is entirely immaterial whether Sheriff Phelps might have hatched any

plot to retaliate against plaintiff on December 5 or earlier, so long as the relevant events occurred

within the statute of limitations (and the events on and following November 6, 2023 clearly did).

If there were any doubt regarding plaintiff's theory of this case, he makes clear in his

brief that:

> The actions taken by the Defendants against Mr. Parttridge on November 6, 2023, and the
> December 5, 2023, and December 7, 2023, arrests of Mr. Parttridge should be viewed in
> their full context. Though the Defendants contend that Plaintiff claims they came up with
> a conspiracy out of the blue on December 5, the actual dynamics in play are more
> complicated and are rooted in activities that took place before then. That is, Mr.
> Parttridge's protest on November 6, 2023, resulted from a number of prior actions taken
> against him by the Sheriff's Department that he believed targeted him specifically.
> However, the heart of the matter at issue and the Defendants' retaliatory conduct against
> him are limited to the exercise of his free speech on that November day and subsequently.

[Brief at 26-27]. This is consistent with this court's own impression of the facts of this case,

discussed above. That is to say, this court believes that plaintiff has strong evidence that Sheriff

Phelps and his wife demonstrated their retaliatory mindset against plaintiff at his November 6

protest, and plaintiff contends that both defendants actively sought to hinder his exercise of his

First Amendment rights on that day. This court has further stated its view that the dispatching of

a Sheriff's Department lieutenant the day after plaintiff posted videos of his protest on social

media clearly raises fact issues as to whether Phelps was continuing his campaign of retaliation

against plaintiff at that time. In this vein, the December 5, 2023 phone call and plaintiff's

subsequent arrest are, this court believes, properly regarded as the mere continuation of

retaliation which had begun earlier. Plaintiff makes clear, in his argument quoted above, that this is his position in this case as well.

As an additional point, this court would note its belief that the fact that, soon after plaintiff's exercise of his First Amendment rights, three separate complaints were filed against him based on the same, rather obscure Mississippi statute is arguably suggestive of some unnamed figure behind the scenes guiding the process. The statute in question provides that:

> It shall be unlawful for any person or persons: (a) To make any comment, request, suggestion or proposal by means of telecommunication or electronic communication which is obscene, lewd or lascivious with intent to abuse, threaten or harass any party to a telephone conversation, telecommunication or electronic communication.

Miss. Code Ann. § 97-29-45(A). Defendant has included a copy of the Justice Court charges filed based on the complaints by Meek-Phelps, Griffin and O'Conner, and they each cite this same statute: § 97-29-45(A). [Exhibit A at pages 63, 72 and 88].

This court seriously doubts that these three complaining citizens (none of whom was a lawyer) each independently concluded that they had been victims of a violation of Miss. Code Ann. § 97-29-45(A), and it seems likely that someone behind the scenes was encouraging them to sue under the statute. In this vein, this court takes judicial notice of a December 08, 2023 article by The Panolian newspaper, cited by plaintiff in his brief. That article states in pertinent part that:

> In that case, Phelps signed a statement saying that Parttridge had called her an "abrasive bitch" and stated "everywhere you go, you will see me." Phelps said she consulted with her husband and Justice Court Judge Michael Darby before making the charge.[4]

---

[4] https://panolian.com/2023/12/08/bville-man-charged-with-obscene-harassing-phone-call-to-melissa-meek-phelps/ Even assuming this article is inadmissible at trial, this court reiterates that Meek-Phelps conceded that she consulted with her husband and Judge Darby in her affidavit. [Ex. A at 83].

As noted previously, plaintiff alleges that Phelps and Judge Darby are friends who both participated in the efforts to suppress his speech on November 6, and this court believes that it is worth inquiring during discovery regarding whether these two individuals had any role in directing the filing of complaint against plaintiff under § 97-29-45(A).

For the reasons discussed above, this court concludes that Phelps' and Meek-Phelps' motions for qualified immunity should be denied. These qualified immunity issues are the only ones which this court is required to rule upon now, and, having done so, any remaining claims which were not addressed above will be considered in a summary judgment motion following discovery. This court notes that plaintiff has filed a motion seeking discovery, writing that:

> As set forth in the Plaintiff's Memorandum in support of his Response to the Motion to Dismiss, there are genuine issues of material fact on which discovery is warranted with respect to qualified immunity and probable cause. Knowledge and information that is not in the Plaintiff's knowledge or possession include, for example: the individuals with whom Sheriff Phelps and Defendant Meek-Phelps spoke while going in and out of the Panola County Courthouse as Plaintiff protested on the Batesville Public Square on November 6, 20231; who Sheriff Phelps spoke with at the Batesville Police Department on November 6, 2023, and what they discussed; and what conversations, if any, Sheriff Phelps had with Defendant Griffin about his affidavit. Discovery is needed from these individuals.
> Rule 56(d) relief is particularly warranted here because the claims against these Defendants involve what their intent in directing and/or submitting affidavits supporting the arrest of Mr. Parttridge is directly in issue. See generally, Complaint [Doc. 1]. Direct proof of intent is often unavailable, but a jury can reasonably infer it from conduct and circumstances, so the Plaintiff should be afforded the opportunity to obtain all of the information and evidence about the Defendants' conduct and the circumstances surrounding his arrests. *See Galaz v. Galaz*, 850 F.3d 800 (5th Cir. 2017); *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000);

[Motion for discovery at 2]. This court agrees with plaintiff that discovery is needed regarding these and other issues, although *Carswell* strongly encourages, if not outright requires, it to rule on the qualified immunity issues in this case prior to such discovery. This court has accordingly done so.

As a final point, this court would note its belief that this is a case which both sides should be eager to settle. For the reasons discussed above, this court believe that defendants must confront some highly adverse facts as it relates to plaintiff's First Amendment retaliation and Fourth Amendment *Franks* claims, and, even if they appeal and prevail before the Fifth Circuit on qualified immunity issues, this will presumably not prevent plaintiff from going to trial against Panola County based upon Sheriff Phelps' actions as its final policymaker, and on state law malicious prosecution claims against individual defendants. This court believes that, as far as plaintiff is concerned, his proof of First Amendment retaliation is strong, but the monetary value of his claims in this case may not be as high as he would like. In this vein, this court believes that jurors may be less than sympathetic towards plaintiff, based on his prior criminal history and the tendency of jury panels in this district to be sympathetic towards law enforcement. In this vein, this court notes that part of defendants' defense in this case is that Meek-Smith acted based upon a fear of plaintiff, and, that being the case, they will likely be permitted to introduce evidence of his violent past at trial. This court therefore believes that it would be in both sides' interest to settle this case and that they should attempt to do so.

In light of the foregoing, it is ordered that defendants' motion for summary judgment [48-1] is granted in part and denied in part, as more specifically set forth in this order. Plaintiff's motion for discovery [64-1] will be granted, following any interlocutory appeal which defendants might choose to make to the Fifth Circuit. Defendants' motion for time [66-1] is dismissed as moot, their motion to exceed page limitations [67-1] is granted and plaintiff's motion to file a sur-rebuttal brief [71-1] is likewise granted.

46

This, the 24th day of February, 2026.

/s/  Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI